UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : <br> : <br> : |
| Plaintiff, | : <br> : <br> : |
| v. | :     Civil Action No.08 cv 4520 (PAC) <br> :     Judge Paul A. Crotty |
| CRISTIAN DE COLLI, | : <br> : |
| Defendant. | : <br> : |

_____

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM IN SUPPORT OF APPLICATION FOR AN *EX PARTE*
TEMPORARY RESTRAINING ORDER FREEZING ASSETS
AND GRANTING OTHER RELIEF, AND FOR AN ORDER TO SHOW
CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT BE ISSUED**

This is an emergency application brought by the Securities and Exchange Commission

("Commission") for an order freezing proceeds from highly suspicious purchases of common

stock and call option contracts[1] for the common stock of DRS Technologies, Inc. ("DRS") made

by Cristian De Colli ("De Colli") in the weeks before an article appeared in the Wall Street

Journal on May 8, 2008, disclosing advanced negotiations for the purchase of DRS by

Finmeccanica SpA ("Finmeccanica") (the "Article").  After likely receiving a tip from his

brother, Gianluca De Colli, who formerly worked for Finmeccanica, De Colli made his

purchases of common stock and call options through an account held by a U.S. broker-dealer.

_____

[1] A call option, or a "call," is a financial contract between the buyer and the seller of this type of option.  The buyer of the option has the right, but not the obligation to buy an agreed quantity of a particular security from the seller of the option at a certain time (the expiration date) for a certain price (the strike price). The buyer pays a fee (called a premium) for this right.  A call option contract typically gives the buyer the right to purchase 100 shares of the underlying security.

The buyer of a call option wants the price of the underlying security to rise in the future; when the market price of the security exceeds the strike price of the option, the purchaser of the option can sell a security purchased through the exercise of the option at the market for a premium.  When the market price of the security surpasses the strike price, the option is said to be "in-the-money."

De Colli bought DRS common stock and near-term, out-of-the-money call option contracts for

DRS common stock, though De Colli sold the common stock days prior to the public disclosure

of the information in order to purchase additional call options, thereby increasing his profit from

the release of the information.

By the close of trading on May 8, following publication of the DRS press release

confirming the Article, the market price of DRS stock had increased by 16 per cent from the

previous day's close.  On that same day, De Colli liquidated his position in DRS call options

realizing total profits of at least $2.13 million, from his initial investment of approximately

$422,000.  As described below, the Commission has reason to believe that De Colli engaged in

illegal insider trading.  Because De Colli resides in Italy and may attempt to repatriate his illicit

proceeds from his U.S.-based securities brokerage account, there is a substantial risk that these

funds will be transferred overseas, where they will be beyond the jurisdiction of United States

courts.  The Commission therefore requests an immediate asset freeze in order to maintain the

status quo and other expedited relief in order to resolve this case without further taxing this

Court's limited resources.

**STATEMENT OF FACTS**

**A.**     **Disclosure of Advanced Merger Negotiations between Finmeccanica and DRS**

Headquartered in Parsippany, New Jersey, DRS is a Delaware corporation that supplies

integrated products, services, and support to military forces, government agencies, and prime

contractors worldwide.  Shares of DRS common stock trade on the New York Stock Exchange

under the ticker symbol "DRS."  Options for the purchase or sale of DRS common stock trade on

the Chicago Board Options Exchange, as well as the Philadelphia Stock Exchange and the NYSE

Arca Exchange.  DRS's common stock is registered with the Commission pursuant to 12(b) of

the Securities Exchange Act of 1934 ("Exchange Act").   [Declaration of E. Laurita Finch

("Finch Decl.") at ¶9.]

Headquartered in Rome, Italy, Finmeccanica designs and manufactures, among other

things, helicopters, civil and military aircraft, satellites, missiles, and defense electronics.  Shares

of Finmeccanica are listed on the Milan Stock Exchange and also trade on the "Pink Sheets" in

the United States under the ticker symbol "FINMF.PK."   [Finch Decl. at ¶10.]

On Thursday, May 8, 2008, the Wall Street Journal reported that Finmeccanica was in

advanced talks to acquire DRS, citing people familiar with the matter, for a purchase price likely

more than 25 per cent higher than its previous-day closing price of $63.74.  That same day, May

8th, via a press release issued through Business Wire at 9:57 a.m. EST, DRS confirmed the Wall

Street Journal report, announcing that it was "engaged in discussions contemplating a potential

strategic transaction."  These disclosures caused a reaction in the market, substantially increasing

the volume and price of DRS common stock.  At the close of trading on May 8th, the price of

DRS common stock was up 15.9% from the previous day, at $73.89, on volume of 8,572,800

shares, compared with an average daily volume over the past three months of 738,948 shares.

[Finch Decl. at ¶ 7.]

In the weeks prior to the Article's publication on May 8, 2008, no major news

organization reported either advanced discussions of an acquisition of DRS by Finmeccanica or

speculation that DRS was a takeover target.  Furthermore, during this time, both DRS and

Finmeccanica took steps to ensure the confidentiality of the acquisition discussions.  The

Commission is unaware of any article or indication of these negotiations available on the Internet

or otherwise.  [Finch Decl. at ¶ 6, 8.]

**B.     De Colli's Suspicious Purchases of DRS**
**Common Stock and Call Options Before May 8, 2008**

Cristian De Colli, 28, resides in Rome, Italy, and earned an engineering degree in 2004.

For the past three years, he has worked as a technician in the machinery department of Technip

Italy SpA, a subsidiary of Technip, a Paris-based provider of engineering, technological, and

project management services for the oil and gas industry.  De Colli's annual, pre-tax salary from

Technip Italy is about 34,000 euros, or approximately $53,000.  [Finch Decl. at ¶ 11.]

In an interview with the staff of the Commission on May 9, 2008, De Colli claimed that

he considered investing in DRS after reading on a website many months ago that DRS might be

a potential takeover target for both Finmeccanica and EADS N.V. ("EADS").  De Colli

attempted to support this assertion by producing an article, dated May 18, 2007, suggesting that

DRS was one of a number of companies that might be a potential takeover target.  He also

claimed that he found DRS to be an attractive investment opportunity after reviewing the

company's financials and determining it was valued less than the company's peers.  [Finch Decl.

at ¶ 12.]

De Colli claims that he began purchasing small amounts of DRS stock on October 17,

2007 through an account with FinecoBank SpA ("Fineco").  De Colli contended that because he

was unable to trade DRS options through his Fineco account, and wanted to attempt to increase

his returns by buying on margin, he submitted paperwork on March 28, 2008 to open a U.S.

brokerage account at E-Trade Financial.  In these papers, De Colli listed his annual income as

between $100,000 and $199,999, his liquid net worth as between $50,000 and $99,999, and his

total net worth as between $100,000 and $499,999.  The account was opened on April 4, 2008.

Over the next several days, De Colli deposited approximately $420,000 in this U.S. account.  He

claimed that he funded the account in part with help from his brother, Gianluca De Colli.

De Colli claimed that no family members, friends, or anyone else he knew had ever worked for either Finmeccanica or DRS.  However, contrary to these representations, De Colli's brother worked for Finmeccanica between 2004 and 2005.   [Finch Decl. at ¶ 15.]

After opening his U.S. brokerage account, De Colli proceeded to purchase DRS common stock and call options with his cash and on margin.  Between April 15 and May 7, De Colli purchased option contracts that were set to expire in the near-term, and which were all out-of-the-money.  In fact, on April 28, 2008, De Colli liquidated securities in two other companies he had purchased a week earlier in order to purchase DRS options.  At that point, 100% of the holdings in the E-Trade account consisted of DRS stock and call options.

As the public announcement grew closer, De Colli accelerated his purchases of DRS call options.  On May 6, 2008, just two days prior to the newspaper article and public announcement, De Colli sold all of his shares of DRS common stock, and used the proceeds to purchase additional call options for DRS common stock.  Of the over 3,116 call options purchased by De Colli, over 2,500 were purchased between May 6 and May 7, including certain options that were out-of-the-money by over $6 and expired ten days after purchase.  Many of these option contracts were set to expire on May 16, 2008, with the remainder set to expire on June 20, 2008. These purchases represented 90% of De Colli's total assets according to De Colli and as represented on his account opening documents.  On May 8th, following publication of the Article and the DRS press release, De Colli liquidated all 3,116 option contracts that he had acquired in the preceeding weeks.  The subsequent sale of those options resulted in trading profits of approximately $2,130,845.  [Finch Decl. at ¶ 16.]  Shortly after liquidating his interest in the DRS call options De Colli attempted to access the funds in the E-Trade account, but his access was prevented by a voluntary hold placed on the account by E-Trade.   De Colli told the

Commission staff that he intends to use the illicit profits in the E-Trade account to purchase a home

in Italy.   [Finch Decl. at ¶ 17.]

**ARGUMENT**

**A.     An Order Freezing the Domestic Proceeds of the Suspicious Purchases in Accounts
        Held By Non-Parties Is Appropriate and Necessary to Protect the Public Interest**

      **1.     Legal Standard for Asset Freeze**

Section 21(d) of the Exchange Act authorizes the Commission to enjoin in a proper U.S.

District Court acts or practices that violate the provisions of, and rules promulgated under, the

Exchange Act.  15 U.S.C. § 78u(d).  Rule 65(b) of the Federal Rules of Civil Procedure permits

the entry of an ex parte temporary restraining order if (i) immediate and irreparable injury, loss,

or damage will result to the applicant before the adverse party can be heard in opposition and (ii)

counsel to the applicant certifies efforts, if any, made to provide notice to the adverse party and

reasons why notice is unnecessary.  Fed. R. Civ. P. 65.

Pursuant to Section 21(d) of the Exchange Act, the United States Court of Appeals for the

Second Circuit has held that the district court has the authority, under proper circumstances, to

order an asset freeze so as "to facilitate enforcement of any disgorgement remedy that might be

ordered in the event a violation is established at trial."  SEC v. Unifund Sal, 910 F.2d 1028, 1041

(2d Cir. 1990); SEC v. Manor Nursing Centers, 458 F.2d 1082, 1106 (2d Cir. 1972).  An asset

freeze "simply assures that any funds that may become due can be collected," and, consequently,

requires a lesser showing than a preliminary injunction in the Second Circuit.  Unifund, 910 F.2d

at 1041; SEC v. Gonzalez de Castilla, 145 F. Supp. 2d 402, 415 (S.D.N.Y. 2001) (an asset freeze

is warranted "even where the SEC has failed to meet the standard necessary to enjoin future

violations of the securities laws").  In particular, the Commission must establish only that it is

likely to succeed on the merits, and need not show risk of irreparable injury, unlike a private

litigant, or likelihood of a future violation.  SEC v. Cavanagh, 155 F.3d 129, 132, 136 (2d Cir.

1998) (citing Unifund, 910 F.2d at 1036, 1041).

However, the Commission may show the likelihood of future violations, and thereby

bolster its application for an asset freeze, SEC v. Margolin, 1992 WL 279735, *6-*7 (S.D.N.Y.

1992), if a defendant has made "efforts to move assets offshore."  SEC v. Vaskevitch, 657 F.

Supp. 312, 314 (S.D.N.Y. 1987); see also SEC v. Bremont, 954 F. Supp. 726, 730 n.3 (S.D.N.Y.

1997) (noting that Commission could have satisfied additional burden of showing likelihood of

future violations where defendants transferred proceeds from transactions at issue to foreign

bank accounts, and one defendant remained out of the United States and held a Liberian

passport).  When considering an asset freeze, a district court must weigh "the disadvantages and

possible deleterious effect of a freeze" against "the considerations indicating the need for such

relief."  SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1106 (2d Cir. 1972).

Under Section 21(d) of the Exchange Act, a district court has jurisdiction to apply a

freeze order to non-parties.  SEC v. Heden, 51 F. Supp. 2d 296, 298-99 (S.D.N.Y. 1999); see

also U.S. v. First Nat'l City Bank, 379 U.S. 378, 384 (1965) (district court's issuance of

temporary injunction freezing assets of non-party bank "eminently appropriate to prevent further

dissipation of assets" from foreign corporation's account).  "Federal courts may order equitable

relief against a person who is not accused of wrongdoing in a securities enforcement action

where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to

those funds."  Cavanagh, 155 F.3d at 136 (internal citations omitted).  A freeze order may also

operate as to assets that are not traceable to the illegal activity.  SEC v. Grossman, 887 F. Supp.

649, 661 (S.D.N.Y. 1995).

**2.      The Commission Is Likely to Succeed on the Merits of Its Claim Against De Colli Because Strong Circumstantial Evidence Suggests He Engaged in Insider Trading in Violation of Exchange Act Section 10(b) and Rule 10b-5**

A person is liable for insider trading under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5] when he obtains material, nonpublic information intended to be used only for a proper purpose and then misappropriates or otherwise misuses that information in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make "secret profits." Dirks v. SEC, 463 U.S. 646, 654 (1983); United States v. Newman, 664 F.2d 12 (2d Cir. 1981). Such a duty arises where the person is an "insider," a "temporary insider," an employee entrusted with confidential information by his employer, or a tippee of any of the foregoing who knew or should have known that the information was obtained in breach of a duty.

Furthermore, in the case of a tippee, liability may be established where an insider transmits the information to another and "receives a direct or indirect personal benefit from the disclosure, such as pecuniary gain or a reputational benefit that will translate into future earnings . . . [or] when an insider makes a gift of confidential information to a trading relative or friend." Dirks, 463 U.S. at 663-64.

Information about advanced negotiations for the possible sale of DRS to Finmeccanica was nonpublic and material. In this type of transaction, both the target company and the potential acquiring company take steps to ensure that information pertaining to the proposed transaction remains confidential until the transactions are announced, and such steps were in fact taken in this case. From this it is reasonable to infer that De Colli obtained the information about the acquisition in breach of a duty.

Moreover, the information was material. Few matters, if any, are more material than a corporation's involvement in a possible merger or acquisition. SEC v. Sekhri, 2002 WL 31100823, at *13 (S.D.N.Y. July 22, 2002) (citations and internal quotations omitted). See e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); SEC v. Musella, 748 F. Supp. 1028 (S.D.N.Y. 1989); SEC v. Tome, 638 F. Supp. 596, 623 (S.D.N.Y. 1986). The market reaction alone to the public announcement of the DRS acquisition transaction, reflected in the rapid 16% increase in the price of DRS on the day the acquisition discussions were disclosed, demonstrates that the information was viewed "by the reasonable investor as having significantly altered the 'total mix' of information made available." Levinson, 485 U.S. at 231-32 (quoting TSC Industries, Inc. v. Northway, Inc., 426 U.S. 439, 449 (1976)).

The circumstantial evidence developed by the Commission to date provides more than sufficient basis for inferring that illegal insider trading has occurred. One who trades in securities while in possession of information that he knows or has reason to know is confidential and was improperly obtained, or who trades in reckless disregard of these facts, acts with scienter. See, e.g., Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44-46 (2d Cir.), cert. denied, 438 U.S. 1039 (1978).

The circumstantial evidence of illegal insider trading includes the fact that De Colli's brother worked for the acquiring company, Finmeccanica, a connection that De Colli falsely denied to the Commission in an interview. Moreover, the pattern of De Colli's trading provides clear circumstantial evidence that he was trading on the basis of the material non-public information, including the fact that he purchased DRS securities and call options almost exclusively immediately after opening a new account a month prior to the public announcement; the fact that De Colli in late April sold his holdings in two other companies in order to purchase

9

more DRS call options; the fact that just two days before the public announcement De Colli

apparently sought to maximize his profits by selling DRS stock and using the proceeds to

purchase DRS call options – including call options that would be completely worthless in less

than two weeks absent a substantial increase in the price of DRS stock; and the fact that De Colli

dramatically increased the number of DRS options he purchased in the two days prior to the

announcement – over 2,500 of the 3,116 call options purchased by De Colli were purchased on

May 6 and 7.

The law does not require direct evidence of scienter: as the Supreme Court has stated,

"proof of scienter required in fraud cases is often a matter of inference from circumstantial

evidence." Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983). This is especially

true in insider trading cases: "[p]roof of insider trading can well be made through an inference

from circumstantial evidence and not solely upon a direct testimonial confession." SEC v.

Singer, 786 F. Supp. 1158, 1164 (S.D.N.Y. 1992) (quoting SEC v. Bluestone, [1990-1991

Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,880 (E.D. Mich. Jan. 24, 1991); accord, Musella,

678 F. Supp. at 1062-63. Indeed, most insider trading cases are based on circumstantial

evidence; "there are generally two people who can provide direct evidence that insider trading

has occurred – the source of the information and the trader. It is very rare for one of these two

persons to admit that they have engaged in insider trading." Elysian Federal Savings Bank v.

First Interregional Equity Corp., 713 F. Supp. 737, 744 (D. N.J. 1989) (quoting H.R. Rep. No.

100-09190, 100th Cong., 2d Sess. at 15, U.S. Code Cong. & Admin. News 1988, p. 6052).

This case is similar to many other insider trading cases where the SEC sought and

obtained emergency relief based on circumstantial evidence that the defendants engaged in

illegal insider trading. For example, in SEC v. Heider, 1990 U.S. Dist. LEXIS 16246 (S.D.N.Y.

1990), the court entered an asset freeze and preliminary injunction against certain overseas

defendants who had purchased large quantities of call options of Contel Corporation just prior to

its merger with GTE Corp., notwithstanding the fact that the Commission had not identified the

source of the material, nonpublic information.  In the context of denying defendants' motions to

dismiss and Rule 9(b) motion, the court recognized:

> Although the S.E.C. has not named the source of the material, non-public
> information allegedly used by defendants . . . the circumstances surrounding the
> defendants' purchases are sufficient to draw a "strong inference" that they had
> scienter. . . . This extraordinary trading activity provides circumstantial evidence
> that the three defendants making these motions had scienter to commit fraud.
> Id. at *11-12.

Likewise, in Unifund, the Second Circuit upheld the District Court's entry of an asset

freeze, despite the fact that the Commission was unable to identify the person who tipped the

trading defendants.

The evidence presented here reflects strong circumstantial evidence that De Colli

illegally traded on inside information, and that the Commission is likely to succeed on the merits

of its insider trading claim under Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

   **3.    Irrespective of the Determination Of Likelihood of Success on the Merits, An
          Asset Freeze Is Still Appropriate Because De Colli Has Attempted to
          Repatriate Funds From His U.S.-Based Brokerage Account**

Courts in this District have frequently granted the Commission orders freezing assets in

insider trading cases where, as here, there was a concern that the defendant might dissipate assets or

transfer assets beyond the jurisdiction of the United States.  See, e.g., SEC v. Certain Unknown

Purchasers of the Call Options of Duracell Int'l, Inc., 96 Civ. 7017 (S.D.N.Y. 1996) (asset freeze

order entered by Judge Scheindlin); SEC v. Roman, 94 Civ. 3621 (SAS) (S.D.N.Y. 1994) (asset

freeze order entered by Chief Judge Griesa); SEC v. Tinajero, 91 Civ. 2708 (JFK) (S.D.N.Y. 1991)

(asset freeze order entered by Judge Owen); SEC v. Heider, 90 Civ. 4636 (CSH) (S.D.N.Y. 1990);

SEC v. Fondation Hai, 90 Civ. 0277 (SWK) (S.D.N.Y. 1990); SEC v. Finacor, 89 Civ. 7667 (JMC) (S.D.N.Y. 1989); SEC v. Wang and Lee, 88 Civ. 4461 (RO) (S.D.N.Y. 1988); SEC v. Banca Della Svizzera Italiana, 81 Civ. 1836 (MP) (S.D.N.Y. 1981).  Indeed, as the Second Circuit has recognized, an order requiring disgorgement will often be rendered meaningless unless an asset freeze is imposed prior to the entry of final judgment.  See, e.g., International Controls Corp. v. Vesco, 490 F.2d 1334, 1347 (2d Cir.), cert. denied, 417 U.S. 932 (1974); SEC v. Vaskevitch, 657 F. Supp. 312, 315 (S.D.N.Y. 1987) ("[a]s to the issue of an asset freeze, the court certainly has the ability to ensure that the defendants' assets are not secreted or dissipated before entry of final judgment concluding this action"); SEC v. General Refractories Co., 400 F. Supp. 1248, 1259 (D.D.C. 1975) (it is within the Court's authority to grant effective equitable relief by temporarily freezing specific assets "in order to assure a source to satisfy that part of the final judgment which might [ultimately] be ordered").

An order freezing assets may also properly be directed to other persons or entities, who allegedly hold the funds on behalf of the defendant.  United States v. First Nat'l City Bank, 379 U.S. 378 (1965).  Moreover, once personal jurisdiction over a party is obtained, it is appropriate to enter a freeze order against that party to prevent the transfer of assets under its control, within or outside the United States.  Id. at 384.

When there are concerns that defendants might dissipate assets, or transfer or secrete assets beyond the jurisdiction of the United States, this Court need only find some basis for inferring a violation of the federal securities laws in order to impose a freeze order.  Where "[t]here is a basis to infer that the . . . [defendants] traded on inside information, and while the Commission is endeavoring to prove at trial the requisite element of trading in breach of a fiduciary duty of which the defendants were or should have been aware, the Commission should be able to preserve its

12

opportunity to collect funds that may yet be ordered disgorged." SEC v. Unifund SAL, 910 F.2d

1028, 1041 (2d Cir. 1990). Indeed, in Unifund the Court upheld an asset freeze order even though it

found that the evidence was insufficient to uphold the entry of a preliminary injunction.

In this case, there is a well-founded basis for concluding that De Colli engaged in insider

trading. Moreover, there is a substantial basis to believe that he may attempt to dissipate such assets

or move them beyond the jurisdiction of this Court. De Colli is a resident of Italy with accounts

outside the United States who used his U.S. E-Trade account for only a limited duration and almost

exclusively for the purposes of trading in DRS. Moreover, De Colli intends to use the illicit profits

in the E-Trade account to purchase a home in Italy. Accordingly, absent intervention by this Court,

the resulting proceeds from the liquidated call options, representing illicit profits of approximately

$2,130,845 will be available to De Colli and could be wire transferred overseas pending a voluntary

hold on the funds presently in place by E-Trade.

An immediate order freezing De Colli's assets, including the account containing the

proceeds from the sales of the call options, is essential if there is to be any hope of enforcing a

potential judgment.

**B.    An Order Granting Expedited Discovery Is Appropriate**

The Commission seeks to depose witnesses, subpoena bank and brokerage records and other

documents, and take other discovery on an expedited basis prior to a hearing on its application for a

preliminary injunction continuing the asset freeze during this proceeding. Due to the gravity and

timing of this situation, the Commission has brought this action expeditiously and has not had an

opportunity to interview all persons who have information relevant to this matter, or to take any

investigative testimony. The opportunity to take discovery prior to the hearing on the continuation

of the asset freeze will enable the Commission to present a more complete evidentiary record to the

Court and will sharpen and focus the issues that must be decided by the Court at such a hearing.

Expedited discovery will also assist the Commission in properly effectuating any order entered by

this Court freezing the accounts in which the illegal securities trades occurred.

**C.      An Order Permitting Alternative Means of Service Is Appropriate**

Rule 4(f)(3) of the Federal Rules of Civil Procedure provides that the Court may

authorize alternative means for service of process in foreign countries.  The Commission

respectfully requests that the Court authorize service upon De Colli by serving him, in the

manner described in the Commission's proposed order, via overnight delivery to the address

provided on De Colli's E-Trade account statements.  The Commission will also make every

effort to serve the defendant personally under Rule 4(f).

**D.      An Order Preventing the Alteration or Destruction of Documents Is Appropriate**

In order to protect all documents necessary for full discovery in this matter, the Commission

seeks an order preventing the alteration or destruction of documents.  Such "innocuous" orders are

routinely granted to protect the integrity of the litigation.  See, e.g., Unifund SAL, 910 F.2d at 1040

n.11.

**CONCLUSION**

For the reasons set forth above, the Commission respectfully requests that its request for

emergency relief should be granted.

Dated:  Washington, D.C.
        May 14, 2008

                                                Respectfully submitted,


                                                _/s/___ Richard E. Simpson _____
                                                A. David Williams (Pro Hac Vice pending)
                                                Richard E. Simpson (RS-5859)
                                                Antonia Chion
                                                Daniel Chaudoin
                                                Noel A. Gittens
                                                E. Laurita Finch
                                                Kevin Guerrero
                                                Attorneys for Plaintiff
                                                Securities and Exchange Commission
                                                Division of Enforcement
                                                100 F Street, N.E.
                                                Washington, D.C. 20549-4010
                                                Telephone: (202) 551-4548 (Williams)
                                                Facsimile:   (202) 772-9246 (Williams)
                                                williamsdav@sec.gov

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on May 15, 2008, I mailed the foregoing Memorandum in Support of Plaintiff's Application For An Ex Parte  Temporary Restraining Order Freezing Assets And Granting Other Relief, And For An Order To Show Cause Why A Preliminary Injunction Should Not Be Issued via Federal Express to:


Cristian De Colli
Via A. Balabanoff, 63
Rome, 00155
Italy


_\_/s/ A. David Williams _____
A. David Williams
